IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF ORLANDO D.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF ORLANDO D., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLANT,

V.

IMESHA D., APPELLEE.

Filed November 6, 2018.    No. A-18-053.

Appeal from the Separate Juvenile Court of Douglas County: LAWRENCE D. GENDLER, Judge. Affirmed.

Donald W. Kleine, Douglas County Attorney, Jennifer C. Clark, Natalie Killion, and Joseph Fabian, Senior Certified Law Student, for appellant.

Jamie C. Cooper, of Johnson & Pekny, L.L.C., for appellee.

MOORE, Chief Judge, and BISHOP and ARTERBURN, Judges.

MOORE, Chief Judge.

## I. INTRODUCTION

The State of Nebraska appeals from the order of the separate juvenile court for Douglas County, which declined to terminate Imesha D.'s parental rights to her son, Orlando D. The juvenile court found that the State had not proved that termination was in Orlando's best interests. Upon our de novo review, we affirm.

## II. BACKGROUND

Imesha is the mother of Orlando, born in March 2010. Imesha is also the mother of Marcus A., born in January 2009. Although Marcus was named in the initial petition filed by the State in

- 1 -

this case, Marcus achieved permanency with his father during the course of this case, and the juvenile court terminated its jurisdiction over him. Because Marcus is not the subject of the present appeal, we do not discuss him further. Orlando was removed from Imesha's care in October 2014 due to allegations of drug use, domestic violence, and inappropriate physical discipline of Marcus. Orlando was placed in foster care on October 24, where he has remained, except for a brief period from April 6 to May 4, 2017, when he was placed with Imesha.

## 1. REMOVAL AND ADJUDICATION

On October 24, 2014, the State filed a petition in the juvenile court, alleging that Orlando came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2014) by reason of the fault or habits of Imesha. Specifically, the State alleged that Orlando was at risk for harm due to (1) Imesha's use of alcohol and/or controlled substances, (2) Imesha's failure to provide him with safe, stable, and/or appropriate housing, and (3) Imesha's failure to provide him with proper parental care, support, and/or supervision.

Also on October 24, 2014, the State filed an ex parte motion for immediate custody with an attached affidavit, alleging that Orlando was seriously endangered in his surroundings, that his continuation in the home would be contrary to his health, safety, or welfare, and that immediate removal appeared to be necessary for his protection. In the affidavit, a caseworker stated that an intake had been received through the "CPS Hotline" on October 20, alleging that Imesha had tested positive for PCP and cocaine while on probation. The affidavit detailed the caseworker's initial assessment, which revealed additional allegations of drug use, domestic violence between Imesha and another adult living in the home, and Imesha's use of inappropriate physical discipline of Marcus. The juvenile court entered an ex parte order on October 24, ordering the Nebraska Department of Health and Human Services (the Department) to take temporary custody of Orlando for placement in foster care or other appropriate placement to exclude Imesha's home.

At a first appearance and protective custody hearing on October 27, Imesha entered a plea of denial to the allegations, which was accepted by the juvenile court. The court ordered Orlando's continued detention outside the family home and that Imesha have reasonable rights of supervised visitation as arranged by the Department. The Department identified the following reasonable efforts pending adjudication: chemical dependency evaluation, random urinalysis, transportation assistance as needed, and exploration of relative foster care. The court ordered Imesha to timely notify the court of any services she deemed necessary to assist with Orlando's return to the parental home and to make reasonable efforts on her own to bring about rehabilitation.

On January 21, 2015, the juvenile court entered an adjudication order, finding Orlando to be within the meaning of § 43-247(3)(a). Imesha admitted to the first count of the petition (that her use of alcohol and/or controlled substances placed Orlando at risk for harm), and the court dismissed the remaining counts pursuant to her plea. The court ordered Imesha to obtain and maintain safe, stable, and adequate housing; obtain and maintain a legal, stable source of income; provide proof of her housing and employment to the case manager; abstain from the consumption of alcohol and the use/possession of controlled substances unless prescribed by a physician and to not associate with others who so used or possessed; submit to random urinalysis/breathalyzer as requested by the case manager; enroll in and successfully complete treatment to address substance

abuse and not engage in conduct that would result in unsuccessful discharge; complete a parenting program by March 15; participate with a family support worker to assist with housing, employment, and budgeting; have reasonable rights of supervised visitation as arranged by the Department; timely notify the court of any services she deemed necessary to assist with Orlando's return to her home; and follow the court's rehabilitation plan and make reasonable efforts on her own to bring about rehabilitation.

## 2. DISPOSITION, REVIEW, AND PERMANENCY PLANNING

Following a continued disposition hearing on March 18, 2015, the juvenile court ordered Orlando's continued placement outside Imesha's home with a permanency objective of reunification. In addition to the previously ordered elements of the rehabilitation plan, the court ordered Imesha to continue in treatment and that her visitation could transition from supervised to semisupervised in a location approved by the Department with only Imesha, Orlando, and the person providing supervision present during the visits.

On May 15, 2015, the State filed an ex parte motion for supervised visitation, alleging that Imesha had been unsuccessfully discharged from treatment in April due to a number of missed appointments, had missed a urinalysis test on April 28, and had tested positive for Phencyclidine on May 6. We note that this statement conflicts with drug testing reports admitted into evidence at the termination hearing, which reflect that while Imesha did miss a urinalysis test on April 28, she tested negative for all substances on May 6. In an affidavit attached to the State's motion, a caseworker stated that Imesha had been participating in semisupervised visits with Orlando since April 4 and that she had reported to the caseworker on April 28 that she was currently homeless. The caseworker also stated that she had received reports that Imesha would be in violation of her probation in June and that she had two active warrants for her arrest for vehicle infractions. Accordingly, the caseworker recommended a return to fully supervised visitation. The juvenile court entered an ex parte order, granting the State's motion on May 15.

A continued hearing on the ex parte motion and order for supervised visitation was held on June 29, 2015. The juvenile court ordered that Imesha was to have two visits per week with Orlando, one supervised and one therapeutic. Imesha was to call 24 hours in advance of scheduled visits to confirm.

On September 16, 2015, the juvenile court entered a review and permanency planning order, finding it was in Orlando's best interests to remain in the Department's custody with placement outside the parental home. The permanency objective remained reunification. In addition to the previously ordered elements of the case plan, the court ordered Imesha to complete a budget within 24 hours (and timely supplements) to assist with determination of her ability to pay for court-ordered services/treatment, successfully complete intensive outpatient treatment, participate in individual therapy to address coping skills, complete a parenting program if one could not be incorporated into therapy or family support, be given the opportunity to attend all medical and educational appointments regarding Orlando, and notify the court, her attorney, and the Department of any changes in her employment, address, or phone number within 24 hours, and in writing. The court entered another review and permanency planning order on January 12, 2016. At that time, the court found that the permanency objective remained reunification with a

concurrent plan of adoption. The court ordered that Orlando undergo a psychiatric evaluation, that Imesha submit to an updated chemical dependency evaluation, and the court authorized hair follicle testing. All orders not modified by the January 12 order were to remain in effect.

### 3. FIRST TERMINATION MOTION AND PLACEMENT WITH IMESHA

On March 21, 2016, the State filed a motion to terminate Imesha's parental rights to Orlando. The State sought termination under Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016). With respect to § 42-292(6), the State specifically alleged that reasonable efforts had failed to correct the conditions leading to Orlando's adjudication under § 43-247(3)(a) in that Imesha had failed to consistently visit Orlando, submit and complete an updated chemical dependency evaluation and provide proof, obtain and maintain housing and employment and provide proof, complete a budget and provide proof, consistently submit to urinalysis testing as requested, consistently attend AA/NA meetings, participate with a family support worker, participate in individual therapy, and utilize the services offered by the Department and Nebraska Families Collaborative (NFC) to reunify with Orlando. The State also alleged that termination was in Orlando's best interests.

On March 29, 2016, Orlando's guardian ad litem (GAL) filed a motion, asking the juvenile court to limit visitation between Imesha and Orlando to only therapeutic visitation. The GAL set forth allegations relating to positive drug test results, cancelled visits, and Imesha's behavior during and lack of preparedness for visits. The GAL subsequently withdrew her motion for therapeutic only visitation and cancelled a hearing that had been scheduled on her motion.

The juvenile court entered review and permanency planning orders on April 27 and October 28, 2016, similar to previous orders. On October 28, the court ordered that visitation remain supervised, that Imesha continue in therapy, that she complete random urinalysis within 8 hours of a request by the case manager, and that she complete an updated chemical dependency evaluation within 30 days. The court later entered a nunc pro tunc order to reflect that Imesha's visitation was actually therapeutic.

On November 29, 2016, Imesha filed a stipulated motion for supervised visits, which was granted by the juvenile court on that same date.

On January 5, 2017, Orlando's GAL filed an unopposed motion to cancel a scheduled "check hearing" regarding termination of parental rights, indicating that the State was withdrawing its motion to terminate Imesha's parental rights and that the GAL did not intend to seek termination. The juvenile court found good cause to sustain the motion and cancelled the hearing. The State subsequently moved to dismiss the first motion for termination of parental rights, which motion was granted by the court.

On February 23, 2017, the juvenile court granted a stipulated motion for unsupervised visits filed by Imesha. The court ordered that visits remain in a neutral location until a walk-through of her new residence could be completed. Imesha filed a stipulated motion for placement on April 6, indicating that she had been participating in unsupervised and overnight visitation with Orlando since February 21, that there were no safety concerns regarding her parenting time during those visits, that she had appropriate housing approved by the GAL and caseworker, and that she was

compliant with all case orders including drug tests, which continued to be negative. The court granted Imesha's motion on that same date.

### 4. SUBSEQUENT REMOVAL AND SECOND TERMINATION MOTION

Despite having granted Imesha's motion for placement, on April 25, 2017, the juvenile court entered a review and permanency planning order, finding that reasonable efforts had been made but that it would be contrary to Orlando's health, safety, and welfare to return to the parental home at that time. The permanency objective was changed to preservation with Imesha. The court ordered Orlando to continue in therapy, and it ordered Imesha to complete treatment and not to engage in conduct/behavior which could result in incarceration.

On May 4, 2017, the State filed an ex parte motion for immediate custody and affidavit for removal, seeking removal of Orlando from Imesha's care due to positive tests for marijuana and cocaine. According to the caseworker's affidavit, she had received confirmation from Imesha's employer after the first positive marijuana test that a coworker had brought "weed brownies" to an employee potluck and that Imesha did not know that the brownies contained marijuana. The caseworker stated that after the second positive for marijuana, Imesha told her that she must have gotten the positive result from being "around a lot of people" on April 20. The juvenile court entered an ex parte order on May 4, ordering the Department to take temporary custody of Orlando for placement in foster care to exclude Imesha's home.

On July 19, 2017, the State filed a second motion for termination of Imesha's parental rights to Orlando. The State again alleged grounds for termination pursuant to § 43-292 (2), (6), and (7) and that termination of Imesha's parental rights was Orlando's best interests. With respect to § 43-292(6), the State alleged that Imesha had failed to visit Orlando consistently, participate in and complete chemical dependency treatment, maintain housing and employment, submit consistently to urinalysis testing, and utilize the services offered to her. The State also alleged that Imesha had engaged in conduct/behavior which resulted in incarceration.

Following a review and permanency planning hearing on October 24, 2017, the juvenile court took a recommendation for updated evaluations concerning Imesha under advisement, but it ordered that all previous orders were to remain in effect. The permanency objective remained reunification with a concurrent plan of adoption.

A termination of parental rights hearing was held before the juvenile court on December 15, 2017. The judge who presided over the hearing was a juvenile court judge in Sarpy County, who was "helping out in Douglas [County]," and was not the same judge who had presided over earlier hearings. The State presented testimony from Orlando's therapist; Orlando's current foster mother; an employee of a drug testing provider; and three caseworkers, all family permanency specialists at NFC. Imesha testified on her own behalf. The court also received various court reports and other documents into evidence. The testimony received at the hearing was as follows.

### (a) Therapist's Testimony

Sarah Isely, a licensed independent mental health practitioner, has provided weekly therapy to Orlando since November 2016 with some breaks in treatment. During individual therapy, Isely helped Orlando learn age-appropriate coping strategies and how to express his feelings verbally.

The frequency of Isely's individual therapy sessions with Orlando decreased around the time Orlando was placed with Imesha, and Isely indicated that it became more difficult to schedule sessions at the end of the school year.

According to Isely, Orlando was confused initially about why he was in foster care, and she helped him process and gain acceptance of his situation. Isely stated that Orlando was currently "sad" and "mad" about being in foster care, although he did not say at whom he was mad. Orlando will occasionally tell Isely that he has seen Imesha at school and that he misses her. Isely feels that Orlando needs to continue in individual therapy with her. Isely stated that much of Orlando's behavior has come from inconsistent contact with Imesha and that when there is not much contact Orlando "seems to stabilize a little bit." She indicated that Orlando needs a consistent, structured, positive, and nurturing home environment in order to continue to learn to express himself appropriately, which needs Isely felt were being met in Orlando's current placement.

Isely also supervised weekly therapeutic visits between Orlando and Imesha, which took place either at school "[o]ver lunch" or at Isely's office. The goal of the therapeutic visits was to improve the bond between Orlando and Imesha and to assess the appropriateness of parent/child roles, by which Isely meant the parent's ability to set limits and respond appropriately to the child's emotional and physical cues. The therapeutic visits went well and had transitioned "more to family therapy" by the time Orlando was placed with Imesha. The therapeutic/family therapy sessions ended when Orlando was returned to foster care.

Isely testified that Imesha participated consistently during the course of the therapeutic/family sessions "for the most part," by which Isely meant that there was "one session where she did not show up in the beginning." She testified further that Imesha improved in her ability to set limits with Orlando, comfort him when he was emotional, and set aside her own emotions to tend to Orlando's needs. Isely observed an appropriate parental bond between Imesha and Orlando, testifying that they were always excited to see each other and greeted one another warmly. She also stated that Imesha was able to meet Orlando's emotional needs during the sessions. Isely testified that at the time when Orlando returned to foster care, further family therapy was needed because of "the inconsistency in contact within the relationship," which "was confusing for Orlando." Isely had not had very many reports from other parties involved, had not had contact with Imesha since Orlando's return to foster care, and did not know if family therapy was still needed at the time of trial.

(b) Foster Mother's Testimony

Orlando was placed with his current foster mother on May 26, 2017, initially as a kinship placement as she is the mother of a half brother of Orlando. The foster mother has been a licensed foster parent since August 2017. She described Orlando's behavior when he was first placed with her as that of a "typical seven-year-old" with "good days" and "bad days." On "bad days," he might be whiny and throw a tantrum if he did not "get his way," but his behavior in her home had never been concerning. When asked about reports of any behavioral issues at school, she testified that since school began she had received about two calls concerning issues with Orlando not being able to "sit still being busy."

When Orlando was first placed with the foster mother, he was to have visits with Imesha "[m]aybe two times a week" but that they had not been having agency-supervised visits since approximately the end of September 2017. The foster mother testified that Orlando does not want to come back from visits with Imesha, shutting down for an hour or two after returning, after which he is fine. His behavior since the end of September has been good, and he has not had any outbursts with regard to not visiting Imesha. The foster mother was not certain what happened with the agency-supervised visits, testifying that she was contacted in November prior to Thanksgiving "to get a time and everything set up," that she was told that she would be contacted once the visits were arranged, but that the visitation agency had never called her back.

Although Orlando has not had agency-supervised visits with Imesha since the end of September 2017, the foster mother has been allowed by NFC to arrange and supervise contact between Orlando and Imesha. The foster mother invites Imesha to Orlando's wrestling practices and meets, which occur several times a week and which Imesha attends consistently, and Imesha calls and talks to Orlando on the phone about every other day. The foster mother also welcomes Imesha to the house for supervised visits. On those occasions, Imesha and Orlando are happy to see one another and interact appropriately. Imesha comes to the house once or twice a week, stays for 30 to 45 minutes, and always contacts the foster mother ahead of time to ask if it is okay for her to visit.

### (c) Drug Testing

An employee of the service provider who has conducted the drug testing of Imesha in this case testified for the State. During her testimony, the juvenile court received a compiled report of the drug testing. The employee testified that Imesha became her client in November 2014 and was still a client of the service provider at the time of trial.

The drug testing report reflects two contacts between the service provider and Imesha occurring on June 12, 2014, prior to Orlando's first removal from Imesha's home. Imesha did not show up for the scheduled drug test, and although the tester waited for 30 minutes Imesha never arrived. A second attempt at drug testing was made later in the day, and Imesha tested positive for cocaine.

The next testing date reflected on the exhibit is November 18, 2014, subsequent to Orlando's removal. During the period between November 18, 2014, and June 23, 2017, the provider successfully conducted 111 tests; the other 57 attempted tests were either missed by Imesha or she was unable to produce a sufficient sample for testing. She tested positive for marijuana and opiates/morphine on November 18, 2014. Imesha explained that she had been prescribed Hydrocodone by her dentist. She had other positive tests for prescribed pain medications during this period, and she provided the tester with documentation of these prescriptions. Imesha also tested positive for marijuana on March 30, 2016, and on April 6, 13, 25, and 30, 2017. She had positive tests for cocaine on November 24, 2014, January 13, 2015, and May 2, 2017. Imesha was discharged as a client on June 23, 2017 due to her incarceration.

Drug testing of Imesha resumed on September 2, 2017. Between that date and December 13, the service provider conducted 19 successful and 10 unsuccessful tests, with the unsuccessful tests again including both missed appointments and occasions when the sample was insufficient.

During this period, Imesha had three positive drug tests: she was prescribed hydrocodone by a hospital emergency room, which resulted in a positive opiate/morphine test on September 7; she was prescribed oxycodone, acetaminophen, and cyclobenzaprine, resulting in a test that was positive for oxycodone on October 25; and she tested positive for marijuana on December 3. Imesha declined/missed three subsequent tests in December, informing the service provider on two of those occasions that she was no longer going to test.

As noted above, after Orlando was placed in Imesha's care in April 2017, he was again removed from her care in early May. The caseworker at that time testified that the second removal occurred because of Imesha's positive drug tests for marijuana in April and cocaine in May. Prior to that point, the caseworker had been considering possibly closing the case. She was concerned, however, by the positive drug test results, testifying that "the ability to parent your child can be altered under the influence of illegal drugs." The caseworker noted that Imesha's positive test result for marijuana on April 6 was arguably the result of tainted brownies she unknowingly consumed at her work place. The caseworker also noted that marijuana stays in a person's system for approximately 30 days, and she agreed that the additional positive marijuana results in April could have been also possibly related to the tainted brownies. Imesha told the caseworker that she was "around a lot of people" on April 20 but did not smoke anything on that date. Imesha also told the caseworker that she did not know how the cocaine was in her system.

Further safety planning after the additional positive tests for marijuana was that Imesha would not use marijuana. Following the positive test result for cocaine, the caseworker did not have any particular recommendations for Imesha at that time. Imesha offered to do additional testing after the positive result for cocaine, and a hair follicle test shortly after the relevant urinalysis test was negative for cocaine.

The caseworker at the time of trial noted Imesha's comments to the drug testing provider on December 7, 2017, that she would no longer be testing with them. That caseworker had not been able to speak to Imesha concerning her comments.

### (d) Drug Treatment

The first caseworker who testified at trial worked with the family between February and September 2015. During this period, Imesha was to participate in chemical dependency treatment at the level of intensive outpatient treatment (IOP). Serenity Matters provided IOP for Imesha until the spring of 2015 when Imesha was unsuccessfully discharged from IOP. After that, the caseworker attempted to stay in contact with Imesha and get her to reengage with the service. Imesha reengaged with treatment through Serenity Matters again in June, but she was unsuccessfully discharged a second time that same month. Imesha successfully completed inpatient treatment with a new provider selected by NFC, Inroads to Recovery, in August. For her "aftercare," Imesha reengaged with IOP through Serenity Matters, and she was engaged in IOP at the time this first caseworker left the case. As far as the caseworker was aware, Imesha was consistent in her IOP treatment at that time. The second caseworker who testified took over the case in December 2015, and she indicated that Imesha completed IOP with Serenity Matters during her tenure on the case.

Imesha completed an updated chemical dependency evaluation in March 2016, which included recommendations that Imesha complete IOP and attend AA meetings. Imesha started but did not complete this recommended IOP, again with Serenity Matters, and was unsuccessfully discharged. Although NFC had paid for the first round of treatment through Serenity Matters, it was not a sliding-fee scale provider, and NFC was unwilling to pay for the second treatment through that facility. Imesha was made aware of the change and was provided with a list of sliding-fee scale treatment facilities and the assistance of a family support worker. Imesha stopped working with Serenity Matters due to the payment issue and did not reengage with any further type of treatment during this caseworker's tenure on the case, which ended in June 2017.

The caseworker who took over in June 2017 and who remained the caseworker at the time of trial testified that he put out a referral for therapy upon Imesha's release from incarceration, which was not picked up by any agency due to the need for an updated chemical dependency evaluation. There was also a delay in scheduling the evaluation, which the caseworker indicated was a scheduling issue and not due to any issue with Imesha. A "co-occurring evaluation" that took place on October 4 recommended level 1 outpatient therapy. The evaluation included four agencies that could provide the recommended therapy. According to the caseworker, Imesha reached out to those agencies in November, and she reported to him that none of the agencies would be able to get her into therapy before the termination proceedings. Imesha did not provide the caseworker with the name of anyone he could contact to verify her report, and he did not reach out to any of these providers himself. The caseworker agreed, however, that treatment is not "available immediately" and that this delay was not Imesha's fault.

(e) Housing and Employment

All three caseworkers indicated that Imesha consistently maintained housing and employment during their involvement in the case, except when she underwent inpatient treatment or was incarcerated. As noted above, Imesha underwent inpatient treatment in August 2015. The specific timing of and reasons for Imesha's incarcerations are not completely clear from the record, but according to one caseworker, Imesha has been incarcerated on more than one occasion during this case. That caseworker testified that Imesha would not inform her when she was incarcerated. The caseworker indicated that Imesha was incarcerated when she left the case in June 2017. The caseworker did not remember how she became aware of Imesha's incarceration in June, but she recalled that Imesha was incarcerated in Iowa. Imesha did call the caseworker during this incarceration and told the caseworker that she did not want Orlando to visit her while was she was in jail. Imesha told the caseworker that she was incarcerated on that occasion because of a probation violation and would remain incarcerated until August. The caseworker who took over the case in June confirmed that Imesha was incarcerated at the Pottawattamie County jail at that time, and he indicated that Imesha made him aware through their telephone contact that she would be released on August 14.

(f) Visitation

In April 2015, Imesha's visits with Orlando changed from supervised to semisupervised, returning to fully supervised in May. The caseworker recommended the return to fully supervised

visits because Imesha had tested positive for PCP in May. Again, we note that this testimony conflicts with the drug testing report admitted into evidence. Imesha began having therapeutic visits with Orlando in June. The caseworker recommended that change based on concerns about Imesha's behavior including falling asleep at visits and becoming aggressive toward Orlando. During this caseworker's tenure on the case, Imesha was fairly consistent in attending scheduled visits with Orlando. The caseworker also indicated that visitation notes attached to her March court report were positive and that her September report reflected that Imesha's interactions during visits were more healthy and positive because she was no longer sleeping through visits or cursing at Orlando. Accordingly, she agreed that by the time she left the case, Imesha had started making progress.

The caseworker between December 2015 and June 2017 agreed that Imesha consistently participated in visits during this period and the visitation notes were mostly positive. As of December 2015, Imesha's visits with Orlando continued to be fully supervised. In the spring of 2016, the caseworker recommended that Imesha's visits with Orlando move from supervised to therapeutic due to concerns that Imesha had been physically forceful toward Orlando during a visit. Imesha's visitation was again liberalized, eventually becoming unsupervised with overnights prior to Orlando's placement with her in April 2017 due to good reports from the visitation agency, her maintenance of housing and employment, and negative drug tests. As noted above, Imesha requested that Orlando not visit her while she was incarcerated in Iowa on a probation violation, and according to the caseworker, all visits were stopped at that time. The caseworker stated that no arrangements were made for Orlando to call Imesha during this period.

The caseworker who took over in June 2017 testified about his efforts to assist Imesha in resuming agency-supervised visitation after her release from incarceration. The caseworker indicated that it took longer than normal for the first visitation agency he contacted to pick up the referral. Imesha had supervised visitation through that agency between September 15 and October 6, when she was discharged due to having canceled and rescheduled nine different visits. Another agency picked up the referral but that agency was unable to make contact with Imesha until November 21. Accordingly, agency-supervised visitation had not resumed at the time of the termination hearing. The caseworker agreed that Imesha was allowed to have visits with Orlando that were supervised by the foster parent.

(g) Reunification Progress and Best Interests

The caseworker between February and September 2015 testified that Imesha made "backwards" rather than forward progress toward reunification during this period. This caseworker based her opinion on Imesha's positive drug tests and behavior during visits. The caseworker was concerned because Imesha did not have a long, sustained period of abstaining from substance use, also noting Imesha's inconsistent drug testing during this period. However, Imesha was responsive to the caseworker's phone calls and attended family team meetings.

Next, the caseworker from December 2015 to June 2017 opined that during her time on the case, Imesha has not made progress toward reunification. Her particular concerns were based on the length of time Orlando had been in foster care, as a result of Imesha's ongoing issues with substance abuse and her inability to maintain sobriety on a long term basis. With respect to the

sobriety issue, she elaborated that while Imesha has done a good job of maintaining sobriety in general, there had been several relapses. According to this caseworker, there were no other services that could have been provided to Imesha in June 2017 when that caseworker left the case because Imesha was incarcerated at that point. The caseworker also stated that upon Imesha's release, there would be no further services that could have been provided to her that had not already been provided. This caseworker opined that termination of Imesha's parental rights, as of June 2017, was in Orlando's best interests based on Imesha's lack of progress in the case and the length of time Orlando had been in foster care. This caseworker agreed, however, that during her time on the case, she was able to maintain constant communication with Imesha and that Imesha attended family team meetings and made her residence available for inspection. She also agreed that Orlando has a good relationship with Imesha.

The caseworker who took over the case in June 2017 opined that Imesha has not made progress toward reunification during his time on the case based on her decreased participation in both agency-supervised visitation and drug testing. He testified that Imesha had made progress "overall" based on Orlando having been placed with her at one point during the case. And, he agreed that he had had consistent contact with Imesha since taking over the case and that her conversations and interactions with him had all been appropriate. The caseworker opined, however, that termination of Imesha's parental rights would be in Orlando's best interests. He based his opinion on "the assessments made that would indicate that it would not be safe for Orlando to return home," a lack of participation with court-ordered services, and the amount of time elapsed since the beginning of the case. He also felt that termination would be in Orlando's best interests "due to having all his safety and emotional needs met by his home which is a potential adoptive home as well." This caseworker testified that there were no additional services that could be offered to Imesha in order to reunify with Orlando, indicating that the Department and NFC had exhausted all possible services that could be offered. He did not believe that Imesha was currently at a point in her case plan where Orlando could safely be returned to her care. The caseworker agreed, however, that when he spoke with Imesha while she was incarcerated, she asked for assistance in obtaining services upon her release. He also agreed that while Imesha was not "100 percent" available for meetings and appointments with him, she always notified him ahead of time on the few occasions when she had to cancel a meeting.

(h) Testimony From Imesha

Imesha testified about her frequent visits with Orlando and playing various sports with him. She testified that they have a good relationship, love one another, and are always happy to see each other. Imesha indicated that she observes Orlando's wrestling activities three times per week and has other visits with him at the foster parent's home two times per week. She expressed frustration in not obtaining services since her release from incarceration in August 2017, and she indicated that she had requested help from the current caseworker in pursuing assistance with Better Together, the Salvation Army, and other options. She testified that the current caseworker told her that given the pending motion to terminate, there was not enough time to arrange these services. Imesha did her own research while incarcerated to find out about other available services, which she described as "in-house services" that help with housing, reunification, and "family services

together." Imesha informed the caseworker of these services, and she was told that the caseworker would look into it. At trial, Imesha requested additional time with her son, stating that she "did mess up or do a couple things that [she] wasn't supposed to do" but that she is "not a bad mother to [her] son." She asked for more time to take advantage of certain support services and asserted that she had been trying to comply with court ordered conditions since her recent release from incarceration. Imesha testified again that she loves Orlando, noted that she was young when she had children, and asserted that she had "matured a lot" during this case. She stated that she wants to stay sober and reunify with Orlando.

### 5. JUVENILE COURT'S RULING

On December 18, 2017, the juvenile court judge who presided over the termination hearing entered his findings and an order declining to terminate Imesha's parental rights. The judge found that while the State had proved statutory grounds for termination pursuant to § 43-292(2) and (7), it failed to prove by clear and convincing evidence that termination was proper under § 43-292(6) or that termination was in Orlando's best interests. The judge wrote a lengthy detailed order explaining his findings and reasoning, and we quote liberally from his order as follows:

> The record here reflects that [Imesha] has not maintained sobriety and almost faced a termination of parental right proceeding long before this one. Given the evidence presented against her, and the evidence provided during frequent court review at that time, a good argument could have been made that she failed to address the issues that initially brought her and her children under the court's jurisdiction and also conclude that it was in Orlando's best interests to terminate parental rights.

> However, the parties appeared to have agreed that the initial Motion to Terminate Parental rights should be withdrawn in order to give [Imesha] additional time to address several identified issues and most notably her drug addiction. The question presented is whether or not, given the extraordinary amount of time Orlando has been in care, it is in his best interests to terminate parental rights. Clearly, the State's allegations within [§ 43-292(2) and (7)] have been proven by clear and convincing evidence.

> Once Orlando returned home in April [2017], the evidence reflected that [Imesha] had been sober for 7 months. While she disputes the cocaine test results[,] the [urinalysis test] showed otherwise. In a termination proceeding the [*Daubert/Schafersman*] standards do not apply. [See] *In re Interest of Rebecka P.*, 266 Neb. 869, 669 N.W.2d 658 (2003). Here there was a subsequent hair follicle test that reflected [Imesha] was not positive for cocaine. For the purposes of these proceedings this Court grants greater weight to the [urinalysis] test; however, recognizes this finding alone must be balanced with other evidence that was presented.

> Because the undersigned is a visiting judge who has not presided over these parties before, great care must be given to ensure that all the evidence is considered with an attempt to understand the "what and why" of the court ordered conditions. Once Orlando returned home, and through the submission of the evidence on this Second Motion, the system is required to ensure that [Imesha] receives reasonable efforts. The most recent [caseworker] admitted that once this motion was filed he ceased to assist [Imesha] in her pursuit of

services. And he admitted that he did not follow up to confirm [Imesha's] assertions that she was unable to locate appropriate treatment [that could be started before the termination hearing]. There was not a prior finding by this Court that reasonable efforts were no longer necessary. This failure [by the caseworker] to do so is concerning.

There is also a concern regarding the most recent removal of Orlando in May of this year. As referenced herein, the undersigned is relying on the positive cocaine [urinalysis results]. However, there was no effort by NFC to craft a safety plan, which would have allowed for Orlando to remain in the home. It was clear from the evidence that the foster mother . . . was a source of extraordinary support for both [Imesha] and Orlando. There was no evidence that [Imesha] posed an immediate safety risk to Orlando, and his removal was certainly a source of confusion and conflict to him as it would be for any child his age (referenced by his therapist during her testimony). Certainly [Imesha's] continued use would at some point pose a significant risk. There appeared to be at least four [caseworkers] and multiple evaluations of [Imesha] with multiple providers. Given her acute issues, these circumstances are a recipe for disaster. Parents in crisis need a trustworthy professional or volunteer in order to succeed. Great credit goes to [the foster mother] and [Isely] in their work to ensure Orlando's stability and welfare. [Imesha] must recognize that without their support and understanding, her circumstances would be significantly [direr]. She must also understand that failing to appear for random urinalysis testing can be considered by others as an effort to hide 'use' and recognize that the system's patience is not endless. Given her past failures, there remains much to be concerned about. Nevertheless, based upon the foregoing this Court finds that the State has failed to prove by clear and convincing evidence [§ 42-292(6)] or that it is in [Orlando's] best interests to terminate parental rights.

After making the above findings with respect to the State's termination motion, the juvenile court ordered Imesha to cooperate fully with the Department and NFC in the provision of services; enroll in an outpatient treatment program with the Department/NFC paying costs not covered by insurance or Medicaid; attend AA/NA meetings as specified in the order; submit to random urinalysis testing as previously ordered; engage in a relationship with a parent mentor or family support worker; participate in family therapy as arranged by the Department/NFC; maintain a suitable residence, gainful employment, and reasonable contact with her caseworker; and participate in consistent supervised visitation, which may be conducted by the current foster mother. The State subsequently perfected its appeal to this court.

### III. ASSIGNMENTS OF ERROR

The State asserts that the juvenile court erred in finding that termination of Imesha's parental rights was not in Orlando's best interests.

### IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Paxton H.*, 300 Neb. 446, 915

- 13 -

N.W.2d 45 (2018). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 910 N.W.2d 789 (2018).

## V. ANALYSIS

### 1. STATUTORY GROUNDS FOR TERMINATION

In order to terminate parental rights, a court must find by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that the termination is in the child's best interests. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). Clear and convincing evidence means that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *In re Interest of Zachary D. & Alexander D.*, 289 Neb. 763, 857 N.W.2d 323 (2015). Although neither Imesha nor the State has challenged any of the juvenile court's findings with respect to the statutory grounds alleged in the State's second motion for termination of Imesha's parental rights, we briefly address those findings given their bearing on our analysis of the best interests issue raised by the State in its appeal.

In this case, the juvenile court found grounds for termination of Imesha's parental rights under § 43-292 (2) and (7). Upon our de novo review, we find that the State presented clear and convincing evidence to support termination of Imesha's parental rights under § 43-292(7). Proof of one statutory ground is needed for termination, and the record clearly shows that statutory grounds for termination of her parental rights exists under § 43-292(7).

Section 43-292(7) provides grounds for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." Orlando was removed from Imesha's care on October 24, 2014, and has been in an out-of-home placement continuously since that time, except for the 1 month period between April 6 and May 4, 2017. The second motion to terminate Imesha's parental rights was filed on July 19, 2017. The termination hearing was held on December 15, and by the time the juvenile court entered its order on December 18, Orlando had been in an out-of-home placement close to 37 months. Our de novo review of the record clearly and convincingly shows that grounds for termination of Imesha's parental rights under § 43-292(7) were proved by sufficient evidence.

The juvenile court did not find sufficient evidence to support termination under § 43-292(6), and we do not need to consider whether termination of Imesha's parental rights was proper pursuant to § 43-292(2) since any one of the 11 statutory grounds identified in § 43-292 can serve as the basis for the termination of parental rights when there is also clear and convincing evidence that termination is in the children's best interests. See *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012). However, we will consider evidence relevant to § 43-292(2) and (6) in our analysis of best interests. Generally, when termination of parental rights is sought under subsections of § 43-292 other than subsection (7), the evidence adduced to prove the statutory grounds for termination will also be highly relevant to the best interests of the juvenile, as it would show abandonment, neglect, unfitness, or abuse. *In re Interest of Mya C. et al.*, 23 Neb. App. 383, 872 N.W.2d 56 (2015).

## 2. BEST INTERESTS AND PARENTAL UNFITNESS

In its appeal, The State asserts that the juvenile court erred in finding that termination of Imesha's parental rights was not in Orlando's best interests.

In addition to proving a statutory ground, the State must show that termination is in the best interests of the child. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that a parent is unfit. *Id.* The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the child's best interests. *In re Interest of Jahon S., supra*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's well-being. *Id.* The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id.*

The State argues that the evidence presented to support the statutory grounds for termination suggests that terminating Imesha's parental rights is in Orlando's best interests. The State notes that the case has been in process for 3 years and that caseworker testimony detailed that Imesha has not made the progress needed in order for reunification. Given our detailed recitation of that evidence above, we do not repeat it here. We agree, however, that while Imesha has made progress at various points in the case, having Orlando returned to her care at one point, she has struggled to maintain sobriety, having relapses and positive drug tests at various points. The evidence is also clear, however, that Imesha has a strong bond with Orlando and has a genuine desire to succeed and reunify with her son.

Nebraska case law shows that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). However, a termination of parental rights is a final and complete severance of the child from the parent and removes the entire bundle of parental rights; therefore, with such severe and final consequences, parental rights should be terminated only in the absence of any reasonable alternative and as the last resort. *In re Interest of Giavonna G.*, 23 Neb. App. 853, 876 N.W.2d 422 (2016). In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Joseph S. et al.*, 291 Neb. 953, 870 N.W.2d 141 (2015).

The juvenile court clearly gave careful and considered thought to the evidence in this case, and with respect to conflicting evidence, we give weight to the fact that it observed the witnesses and accepted one version of the facts over the other. See *In re Interest of Kane L. & Carter L.*, 299

Neb. 834, 910 N.W.2d 789 (2018). While Orlando has been in out-of-home care for more than 3 years, there have been periods of substantial compliance with the Department's plan by Imesha, and he was returned to her care for a short period of time. Despite Imesha's efforts to reengage with services after her release from incarceration in August 2017, the Department essentially ended all services due to the pending termination motion. Nevertheless, Imesha continued to engage in supervised visits allowed by the foster mother when agency-supervision was not available to Imesha, and Imesha has proved considerate and cooperative in scheduling these visits.

We note that one of the caseworkers felt that termination of Imesha's parental rights would be in Orlando's best interests because his needs were being met in the foster placement, which is a potential adoptive home. However, when deciding whether to terminate parental rights, a court should not consider that an adoptive family has been identified. *In re Interest of Destiny A. et al.*, 274 Neb. 713, 742 N.W.2d 758 (2007). See, also, *In re Interest of Jaydon W. & Ethan W.*, 25 Neb. App. 562, 909 N.W.2d 385 (2018) (court may not deprive parent of custody of child merely because court reasonably believes that some other person could better provide for child).

Despite Imesha's various setbacks with respect to drug usage, she has maintained housing and employment consistently throughout this case and has been generally cooperative with the caseworkers, open and responsive to communications, and proactive in requesting services. The evidence reveals that there is a strong bond between Imesha and Orlando and that Imesha generally met his needs during their periods of contact.

The juvenile court found, in essence, that the Department failed to provide reasonable efforts for the reunification after June 2017. We agree with the juvenile court's assessment that there "remains much to be concerned about" regarding Imesha and her ability to reunify with Orlando. However, we can find no error in the juvenile court's decision to give her additional time to rehabilitate herself. Upon our de novo review of the unique facts of this case, we conclude that the State failed to show by clear and convincing evidence that termination of Imesha's parental rights was in Orlando's best interests.

## VI. CONCLUSION

In our de novo review of the record, we conclude that the State failed to show by clear and convincing evidence that termination of Imesha's parental rights was in Orlando's best interests.

AFFIRMED.

ARTERBURN, Judge, dissenting.

In my opinion, the State presented clear and convincing evidence that termination of Imesha's parental rights is in Orlando's best interests. While due weight must be given to the fact that the juvenile court had the opportunity to observe the witnesses and accept one version of the facts over the other, our standard of review in juvenile cases is de novo on the record. As such, my conclusion differs from that of the juvenile court and the majority herein. Therefore, I respectfully dissent.

My analysis starts with the length of time Orlando had spent in out-of-home placement prior to the termination hearing. Orlando was removed from Imesha's care in October 2014. At the time of the termination hearing, Orlando had been in foster care for 37 of the 38 months the

- 16 -

case had been open. As of the time of the hearing there was little evidence presented that Imesha was nearing parental maturity such that reunification could be accomplished in the near future. In fact, the evidence demonstrated that approximately 2 weeks prior to the hearing, Imesha had again tested positive for marijuana and then declined or missed the next three scheduled tests. At that point she informed the drug testing provider that she was no longer willing to test. Considering that one of the primary reasons Orlando was removed from Imesha's care was drug abuse, this stance is troubling.

During the course of this case Imesha tested positive for marijuana and cocaine in 2014, PCP and cocaine in 2015, marijuana in 2016, and cocaine and marijuana in 2017. In addition, during the 38-month period preceding the termination hearing, she either failed to appear or provided insufficient samples for testing on 67 of 207 occasions. While these tests are technically not "positives" they should not be discounted. The National Drug Court Institute recommends that language be included in the contract of every drug court participant that failure to test or the provision of an insufficient sample for testing should be a basis for imposition of sanctions. See, e.g., *Drug Court Judicial Benchbook*, 2011, National Drug Court Institute. In essence, in the drug court scenario, a missed test is treated the same as a failed test. Here, it may be that Imesha remained drug free for periods of time, but when she has failed to test or provide a sufficient sample on approximately one third of her testing dates, her failures to test can be considered 67 positive tests at most and must be considered highly suspect at least.

Imesha has also struggled with compliance with drug treatment. She was unsuccessfully discharged from outpatient treatment twice in 2015 before successfully completing inpatient treatment in August and aftercare which included further outpatient treatment in December. However, following a positive drug test in March 2016 she was again referred to further outpatient treatment and AA meetings. She entered treatment but was unsuccessfully discharged and completed no further treatment thereafter. After further positive drug tests in April and May 2017, she lost custody of Orlando again and was subsequently jailed in Iowa on a probation violation. She did undergo a co-occurring disorder evaluation and was recommended for level one therapy. As of the time of the termination hearing she had not been able to begin that treatment program. Coupled with her decision to cease undergoing drug tests and her positive marijuana test just prior to the hearing, it is clear that Imesha had still not become willing to commit to recovery and a sober lifestyle.

Visitations between Imesha and Orlando have been characterized by highs and lows. In 2015, visits began on a supervised level then progressed to semisupervised. The visits reverted back to supervised after Imesha was observed to be sleeping and cursing at Orlando. In 2016, the visits transitioned to therapeutic due to concerns of physical force used on Orlando during supervised visits. At that point a positive trajectory followed with a progression toward unsupervised visits and then placement of Orlando back with Imesha in April 2017. Unfortunately that placement was short lived and visitation ceased while Imesha served time in jail. Following her release, a few agency supervised visits occurred, but were ended with her unsuccessful discharge. Thereafter visits have been arranged directly between the foster parent and Imesha. The foster mother testified that Imesha calls in advance, then visits one to two times per week for 30 to 45 minutes. The evidence does demonstrate that Orlando does enjoy his time with Imesha and

that he is sad to see her leave. Unfortunately, the evidence does not indicate that Imesha has been able to successfully transition from having positive short term visits to an actual responsible parenting relationship with her son.

In addition to the positive interaction during visits, Imesha does have strengths which cannot be discounted. She has shown the ability to maintain employment and appropriate housing through most of the pendency of the case despite time away due to treatment and incarceration. She loves Orlando and wants to maintain her relationship with him. Unfortunately, her inconsistency has served to destabilize Orlando's life. According to Sarah Isely, Orlando improved over time as visitation increased and Imesha obtained placement. However, when Imesha's relapse occurred and she went to jail, Orlando was confused, sad, and mad. She opined that Orlando was now in need of continued therapy due in part to Imesha's inconsistency in visitation. Isely testified that Orlando needs consistency in order to stabilize.

Finally, the testimony of the various caseworkers who have been assigned to this case support termination. Testimony was given regarding the services offered and utilized by Imesha during the course of the case. The final two caseworkers, Libby Garrett and Kenneth Kishiku, both testified that following Imesha's release from jail in 2017, there were no other services that could be provided that had not already been provided. Despite this, Kishiku still worked with Imesha to help her obtain a co-occurring evaluation and provided her with contact information for agencies that could provide her treatment on a sliding fee schedule. He also set up drug testing and visitation services, both of which Imesha subsequently refused to work with resulting in their termination. Both Kishiku and Garrett ultimately opined that based on the exhaustion of services and Imesha's lack of progress in participation in those services, her parental rights should be terminated.

As stated by the majority, the appellate courts of this state have often repeated that children cannot, and should not, be suspended in foster care to await uncertain parental maturity. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). Orlando had waited over three years for parental maturity as of the date of the termination hearing. Unfortunately, the evidence adduced provided little hope that Imesha was on track to reach that level of maturity in the foreseeable future. However, given the majority opinion in this case, I hope I am proved wrong. There is no record before us (nor can there be) that tells us what has transpired since December 2017. If a second chance offered by the juvenile court and this court have motivated Imesha to work toward and obtain that level of maturity needed to successfully parent Orlando, then the right result will have been reached. Unfortunately, in my view, the record before us does not support that result. Therefore, I must respectfully dissent.